UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PRECISE MATERIAL SERVICES, INC., and ANDERSON NANCY, <br><br>Plaintiffs, <br><br>vs. <br><br>TEAMSTERS LOCAL UNION NO. 135, <br><br>Defendant. | No. 1:15-cv-00844-LJM-DKL |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Defendant Teamsters Local Union No. 135 ("Local 135") has moved for summary judgment on all the claims in Plaintiffs', Precise Material Services, Inc. ("Precise"), and Nancy Anderson ("Anderson") (collectively, "Plaintiffs"), Amended Complaint. Dkt. No. 38. For the reasons stated herein, Local 135's Motion for Summary Judgment is **GRANTED**.

### I. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Goodman v. Nat'l Sec. Agency, Inc.*. 621 F.3d 651, 654 (7th Cir. 2010). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Goodman*, 621 F.3d at 654; *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## II. **UNDISPUTED FACTS**

The Complaint and Amended Complaint in this case were filed by an attorney. *See* Dkt. Nos. 1 & 5. On October 10, 2016, Local 135 filed its Motion for Summary Judgment. Dkt. No. 38. On the same date, Plaintiffs' counsel moved to withdraw. Dkt. No. 37. On October 13, 2016, the Court held a hearing on the motion and granted it, notified Anderson that Precise could not proceed without counsel, and ordered Precise to obtain counsel on or before November 28, 2016. Dkt. No. 42. Precise and Anderson did not cause counsel to appear by that date and at the Status Conference held on November 29, 2016, Anderson reported that she had not yet retained counsel. Dkt. No. 43. At that

2

Conference, the Court also reminded Anderson that Precise could not proceed *pro se*, and reminded Anderson of the December 19, 2016, deadline to file a response to Local 135's Motion for Summary Judgment. *Id.* To date, Anderson has not filed a response and no attorney has appeared for Precise; therefore, the Court must conclude that there is no genuine issue of material fact as to Local 135's Statement of Material Facts Not In Dispute. *See Steward v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir. 1993), *cert. denied*, 510 U.S. 1121 (1994); S.D. Ind. L.R. 56-1(f)(1). However, summary judgment in favor of Local 135 is not automatic; rather, the Court must determine that given the undisputed facts, summary judgment is proper as a matter of law. *See Wienco, Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992).

The material facts not in dispute are:

Local 135 is an unincorporated labor association headquartered in Indianapolis, Indiana. Dkt. No. 18, Local 135's Ans. to Am. Compl. ¶ 9. Precise is a trucking and hauling company headquartered in Lebanon, Indiana. Anderson Dep. at 15 & Exh. 1. Anderson is the owner and President of Precise. Anderson Dep. at 10, 15; & Anderson Dep. Exh. 1.

Precise was incorporated on May 20, 2009. Anderson Dep. at 10; & Anderson Dep. Exh. 1. Precise began performing hauling services on road construction projects in 2012. Anderson Dep. at 10-12, 14. Precise went out of business in November 2013. *Id.* at 13.

Prior to 2012, Precise was solely engaged in leasing trucks to a trucking company called Circle City Hauling, which is owned by Anderson's husband, Rick Anderson ("Rick"). Anderson Dep. at 10-12.

3

Precise was party to a collective bargaining agreement (the "CBA") with Teamsters Joint Council 69, which is comprised of five Teamster local unions in the state of Indiana, including Local 135. Anderson Dep. Exh. 2 ("CBA"). The CBA was signed on Precise's behalf by Anderson as "Owner/President" on May 7, 2012. *Id.* The CBA covers, among other things, "the hauling of construction materials to, from and on the job site by the Employer . . . ." *Id.* at 5.

Article 15 of the CBA contains a grievance procedure culminating in final and binding arbitration before an arbitrator from the Federal Mediation and Conciliation Service ("FMCS"). *Id.* at 20-21. Anderson was aware of the grievance procedure contained in the CBA, but she did not file a grievance before filing this lawsuit, nor was she prevented from doing so. Anderson Dep. at 24, 40.

Article 22 of the CBA requires signatory employers to make health and welfare contributions on behalf of their employees to the Indiana Teamsters Health Benefits Fund for their employees' health and welfare benefits. CBA at 24-26.

Article 23 of the CBA requires signatory employers to make contributions on behalf of their employees to the Indiana Teamsters Pension Fund or the Central States Pension Fund for their employees' retirement benefits. *Id.* at 28-31. Precise agreed to contribute to the Indiana Teamsters Pension Fund. Anderson Dep. at 29; Anderson Dep. Exh. 4.

Articles 22 and 23, respectively, provide that if a signatory employer fails to make its health and welfare or pension contributions on behalf of its employees, the employees and their local union "shall have the right to take such action as they deem necessary, including, but not limited to, the following: (1) refraining from work, strike and picketing

4

until such delinquent payments are made, and/or (2) commencing a lawsuit to collect the delinquencies." CBA at 25, 30.

The CBA also contains a "Protection of Rights" provision that provides, in part, "it shall not be a violation of this Agreement, and it shall not be cause of discharge or discipline, if any employee or employees refuse to go through the primary picket line of any Local Union or any other union, nor shall the exercise of any rights permitted by law be a violation of this Agreement." *Id.* at 21.

In addition to the CBA, Precise also signed participation agreements with the Indiana Teamsters Health Benefits Fund and the Indiana Teamsters Pension Fund. Anderson Dep. Exhs. 3 & 4. The Health Fund Participation Agreement required Precise to make contributions to the health fund for its employees' health insurance of $7.76 per hour worked up to fifty hours per week beginning on May 7, 2012, until April 1, 2013 (when the rate was open for change). Anderson Dep. Exh. 3. The Pension Fund Participation Agreement required Precise to make contributions to the pension fund for its employees' retirement benefits of $2.50 per hour beginning on May 7, 2012. Anderson Dep. Exh. 4.

Precise became delinquent on its health and welfare and pension contributions in September 2012. Anderson Dep. at 32; Anderson Dep. Exh. 5. The check that Precise wrote for its September 2012 contributions bounced. Anderson Dep. at 32-33. Precise also failed to make any contributions for its employees' health and welfare and pension benefits in October, November, and December 2012. Anderson Dep. at 33-34; Anderson Dep. Exh. 6.

Local 135 did not strike or picket Precise for failing to make its contributions even though it had the right to do so under the CBA. Anderson Dep. at 43; CBA at 25, 30. In fact, Local 135 did not strike or picket Precise at any time. Anderson Dep. at 34.

The Indiana Teamsters Health Benefits Fund and the Indiana Teamsters Pension Fund filed suit against Precise in August 2013 to recover the unpaid contributions, and obtained a judgment in October 2014 in the amount of $22,646.25. Anderson Dep. Exhs. 7 & 10.[1] Precise has made no effort to satisfy this judgment because, in Anderson's "opinion," "the judgment is wrong." Anderson Dep. at 39.

As previously stated, 2013 was the last year that Precise was in business. Anderson Dep. at 13. Precise did not make a profit in any of the years that it was in business. Anderson Dep. Exhs. 18-20; Anderson Dep. at 78-79, 101. Specifically, in 2010, Precise lost $39,845.00, with total receipts of $117,410.00 and expenses of $157,255.00. Anderson Dep. Exh. 18. In 2011, Precise lost $5,878.00, with total receipts of $179,681.00 and expenses of $185,559.00. Anderson Dep. Exh. 19. In 2012, Precise lost $9,177.00, with total receipts of $1,002,904.00 and expenses of $1,012,081.00. Anderson Dep. Exh. 20.

Although Plaintiffs did not provide Precise's 2013 tax returns in discovery, Anderson testified that Precise did not make a profit in 2013, and that it lost more money in 2013 than it did in 2012. Anderson Dep. at 78-79, 101.

---

[1] Anderson testified in her deposition that Precise was not represented by an attorney in unpaid contributions litigation. Anderson Dep. at 37. That is not true. Attorneys Daniel Michael Drewry and Christopher Steven Drewry filed appearances and an Answer on Precise's behalf, but later withdrew their appearances. *See* Case No. 1:13-cv-01225-WTL-DML, Dkt. Nos. 6, 7, 11, 14, & 15.

Anderson maintained Precise's only business account at Farmers Bank. Anderson Dep. at 79-80. Precise's banking records for 2010 through 2013 were exchanged during discovery. Anderson Dep. Exhs. 14-17. These banking records show numerous withdrawals at casinos, including, but not limited to, Seminole Hard Rock Tampa (*see, e.g.*, Anderson Dep. Exh. 14 at 512[2]; Anderson Dep. Exh. 15 at 551; Anderson Dep. Exh. 16 at 597); Hoosier Park Casino in Anderson (*see, e.g.*, Anderson Dep. Exh. 14 at 520); Hollywood Casino in Lawrenceburg (*see, e.g.*, Anderson Dep. Exh. 16 at 637); and Indiana Grand in Shelbyville (*see, e.g.*, Anderson Dep. Exh. 17 at 648). Anderson testified that each of the casino withdrawals reflected in Precise's bank account statements represent times that she used that money for gambling. Anderson Dep. at 96.

The Precise bank account statements that were exchanged during discovery reflect casino withdrawals in each of the months that Precise failed to pay its employees' health and welfare contributions. *See* Anderson Dep. Exh. 17 at 659 (withdrawals at Horseshoe and Bally's casinos in Tunica, MS in September 2012); 669-70 (withdrawals at Hoosier Park Casino in Anderson in October 2012); 679-81 (withdrawals at Hoosier Park Casino in Anderson in November 2012). The bank statements for December 2012 were not provided during discovery, despite the fact that they were requested and Anderson assured Local 135's counsel during her deposition that "I will get you December's bank statements." Anderson Dep. at 96.

---

[2] The page numbers cited here reference the Bates Stamp on the bottom right of each page.

7

Precise's bank statements for 2012 and 2013 reflect a total of $79,998.02 in withdrawals and payments relating to casino gaming, including $31,248.24 during the period from September 2012 forward when Precise had stopped making its health and pension contributions for employees. Anderson Dep. Exhs. 16 & 17.

There are also numerous instances in the bank statements of transfers to "Business Checking ****0439." *See, e.g.*, Anderson Dep. Exh. 16 at 670; Anderson Dep. at 87. These reflect non-business related transfers to her husband's business's account, Rick Anderson, Inc. Anderson Dep. at 88. Anderson does not recall exactly what these transfers are for, although she testified that they "could have" been for the mortgage on their home, because the mortgage came out of Rick's business account, or it "could have" been to pay back money that Anderson borrowed from her husband. Anderson Dep. at 89, 91.

Precise's bank statements for 2012 and 2013 reflect a total of $142,313.10 in unexplained transfers to Rick Anderson, Inc., including $91,843.10 during the period from September 2012 forward when Precise had stopped making its health and pension contributions for employees. Anderson Dep. Exhs. 16 & 17.

The Andersons' joint personal tax returns in 2012 and 2013 show no income or wages from Precise. Anderson Dep. Exhs. 23 & 24. The 2012 tax return shows $82,523.00 in gambling winnings. Anderson Dep. Exh. 23. It also shows $18,202.00 in unemployment compensation. *Id.*

The Amended Complaint alleges that in March 2013, Local 135's Business Agent Mike Berry ("Berry") called Anderson and "told [her] that if he sees me on any jobs, he will run me off of them." Anderson Dep. at 50; Am. Compl. ¶ 21. According to Anderson,

Berry said this directly to her in a phone conversation that lasted ten minutes. Anderson Dep. at 51 & 55.

The Amended Complaint further alleges that representatives of Local 135 made "numerous threats . . . to companies to terminate their business relationships with Precise." Comp. ¶ 33. These companies include: Fox Hauling & Construction ("Fox"); AJ's Tool Rental ("AJ's"); Mr. Mark Smith ("Smith"); and CMG Trucking ("CMG"). Am. Compl. ¶¶ 22-32; Anderson Dep. at 75.

More specifically, in March 2013, Plaintiffs allege that Fox stopped doing business with Precise. Am. Compl. ¶ 23. Anderson alleges that this was because Berry told "Mel," an employee of Fox, that if Fox used Precise, there would be "'hell to pay' in the form of picketing and/or forcing [Fox] to pay amounts claimed to be owed to the Teamsters Union by Circle City and Precise." Am. Compl. ¶ 22. Anderson has no personal knowledge of this allegation, but rather claims to have been informed of it by Mel "about a week after" it allegedly occurred. Anderson Dep. at 57. Anderson does not know if Berry threatened to picket Precise or Fox. *Id.* Anderson stated that Mel told her that Berry told Mel "he would picket any jobs that I was on." Anderson Dep. at 58.

Plaintiffs allege that in May 2013 Precise began to do business with AJ's that consisted of one truck. Am. Compl. ¶ 24. Plaintiffs allege that on June 24, 2013, Berry and an unknown person from Teamsters Local 716 in Indianapolis called "Kimmy" at AJ's and "threatened to picket the job if AJ's continued to use Precise." *Id.*; Anderson Dep. at 64. According to Anderson, the threat to picket the job was because Precise was on the job site. Anderson Dep. at 64. Anderson claims to have learned this information through a conversation with Kimmy. *Id.* Anderson claims to have a recording of Kimmy, although

9

she did not say what is on it. *Id.* Anderson admits she has nothing in writing from Kimmy regarding this allegation. *Id.*

The Amended Complaint also alleges that Precise was able to "find work with Mr. Mark Smith on non-union jobs," and that on or about June 24, 2013, the "Teamsters Union . . . contacted Mr. Smith and demanded that he stop using Precise." Am. Compl. ¶ 29. Anderson claimed in her deposition that the Teamsters agent who contacted Smith was Berry. Anderson Dep. at 68. According to Anderson, Precise worked for Smith on a "sporadic basis"—"maybe once or twice a week." *Id.* Anderson testified that Smith told her that Berry called him and "asked" him to stop using Precise. Anderson Dep. at 69. Neither in the Amended Complaint nor in her deposition did Anderson allege or testify that Berry threatened Smith in any way. Am. Compl. ¶ 29; Anderson Dep. at 69. Further, the Amended Complaint does not allege that Smith stopped doing business with Precise after this alleged conversation, Am. Compl. ¶ 29, and in her deposition Anderson testified that Smith continued to use Precise after this alleged conversation between him and Berry. Anderson Dep. at 69.

Anderson also claims that in late June 2013, Precise had a leasing relationship with CMG whereby CMG agreed to lease Precise's trucks, and that an unknown person from Teamsters Local 716 called "Summer" from CMG and demanded that CMG remove its signs from the Precise trucks and informed her that the Teamsters could terminate CMG's contract. Anderson Dep. at 72-73.

Plaintiffs filed their original Complaint on May 29, 2015, Dkt. No. 1; and Amended Complaint on June 26, 2015, Dkt. No. 5.

### III. ANALYSIS

Precise is without a lawyer and the Seventh Circuit has confirmed that a corporation must appear by counsel or not at all. *See Strong Delivery Ministry Assoc. v. Bd. of Appeals of Cook Cty.*, 543 F.2d 32, 34 (7th Cir. 1976). As outlined above, the Court ordered Precise to obtain counsel on or before November 28, 2016. Dkt. No. 42. No counsel made his or her appearance and on November 29, 2016, Anderson was warned that the Court would not further extend the deadline to file a response to Local 135's Motion for Summary Judgment and that she could not file a response on Precise's behalf. Dkt. No. 43. Since November 29, 2016, no attorney has filed an appearance for Precise. Therefore, dismissal of Precise's claims against Local 135 is warranted.

### A. COUNTS II & III

With respect to Anderson's claims, Local 135 asserts that Count II, alleging Intentional Interference with Business Relationships; and Count III, alleging Intentional Infliction of Emotional Distress; are pre-empted by the National Labor Relations Act ("NLRA"), § 301, 29 U.S.C. § 185 (addressing where suits against a union for violation of contracts may be brought) & § 8(b)(4), 29 U.S.C. § 158(b)(4) (making unfair union attempts to threaten, coerce or restrain an entity from doing business with another); and the Labor-Management Relations Act ("LMRA"), § 303, 29 U.S.C. § 187 (prohibiting unfair labor practices by a union).[3] Dkt. No. 39 at 13-15. The Court agrees that Counts II and

---

[3] The relevant part of NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4), states: "It shall be an unfair labor practice for a labor organization or its agents--- . . . (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where . . . an object thereof is---(B) forcing or requiring any person . . . to cease doing business with any other person . . . ."
 The relevant part of LMRA § 303, 29 U.S.C. § 187, states: "It shall be unlawful . . . for any labor organization to engage in any activity or conduct defined as an unfair labor

III are preempted by the NLRA and LMRA. Specifically, in *San Diego Trades Council v. Garmon*, the Supreme Court concluded "that . . . activities . . . protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8," are preempted by federal law. 359 U.S. 236, 244-45 (1959). *See also Kolentus v. Avco Corp.*, 798 F.2d 949, 961 (7th Cir. 1986) (stating that "[a] state law claim is presumptively preempted where the unlawful activity charged actually or arguably constitutes an unfair labor practice under the NLRA") (citation omitted).

Further, in *Smart v. Local 702 IBEW*, the Seventh Circuit addressed whether an electrician's state law claims of unfair business practices based on a union's threats to have its members withhold work if a company used the electrician's services were preempted by either the NLRA or the LMRA. 562 F.3d 798, 804-09 (7th Cir. 2009). The *Smart* court concluded that LMRA § 303, 29 U.S.C. § 187(b), "*completely* preempts state-law claims related to secondary boycott activities" such as threats to withhold work and the like, which are described in NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4). *Id.* at 808 (emphasis in orginal). The actions complained of by Anderson in Count II mirror the prohibitions found in NLRA § 8(b)(4), and by reference, LMRA § 303; therefore, it is preempted.

Moreover, in *Filippo v. Northern Indiana Public Service Corp.*, the Seventh Circuit concluded that the plaintiff's intentional infliction of emotional distress claim was preempted by § 301 of the LMRA. 141 F.3d 744, 750-51 (7th Cir. 1998). The *Filippo* court stated that "[t]he LMRA displaces a state-law claim if resolution of the claim 'requires the

---

practice in [29 U.S.C. §] 158(b)(4) . . . ." In other words, NLRA § 8(b)(4) is incorporated into LMRA § 303.

12

interpretation of a collective-bargaining agreement.'" *Id.* at 750 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988)). In this case, Anderson's allegations that Local 135's actions regarding purported threats of strikes and/or picketing were "extreme and outrageous" necessarily requires interpretation of the CBA, which specifically allows for the unions to strike or picket employers in certain situations. CBA at 25, 30. Therefore, Count III is preempted by the LMRA.

### B. COUNT I

In Count I of the Amended Complaint Anderson alleges that Local 135 threatening/pressuring behavior violates the NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4), and LMRA § 303, 29 U.S.C. § 187(b). Am. Compl. ¶¶ 34-38 (citing NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4); and LMRA § 303, 29 U.S.C. § 187). First, with respect to Anderson's allegations as to Fox, Local 135 asserts that Count I was filed too late because it was filed after the two-year statute of limitations expired. Dkt. No. 39 at 16. The Court agrees. Local 135 correctly states that a two-year statute of limitations applies to Anderson's NLRA § 8(b)(4) and LMRA § 303 claims. *Id.* (citing, *inter alia*, *Int'l Union of Elevator Constructors v. Home Elevator Co.*, 798 F.2d 222, 230 (7th Cir. 1986)). Berry's alleged conversation with Fox occurred on or around mid or late March 2013. Am. Compl. ¶¶ 21-22; Anderson Dep. at 56-57. Therefore, the Complaint, filed on May 29, 2015, was filed two months after the statute of limitations expired.

As to Anderson's claims regarding Local 135's alleged threats directed to AJ's, Smith and CMG, Local 135 contends that none are actionable because it did not engage in unlawful secondary activity. Dkt. No. 39 at 17-27. To establish a secondary coercion claim under the NLRA, Anderson must prove that Local 135 "threatened, coerced or

13

restrained [the companies] to cease doing business" with her; and that the "*object* was to force [the companies] to cease doing business" with her, rather than just attempting to persuade the companies to refrain from using Precise. *Printpack, Inc. v. Graphic Commc'ns Int'l Union Local 761-S*, 988 F. Supp. 1201, 1204 (S.D. In. 1997) (emphasis added). *See also 520 Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 720 (7th Cir. 2014); *Milwaukee Plywood Co. v. NLRB*, 285 F.2d 325, 329 (7th Cir. 1960). As to the first element, the Seventh Circuit has concluded that the coercive conduct "must threaten neutral parties with substantial loss or ruin." *520 Mich. Ave. Assocs.*, 760 F.3d at 719. In other words, "a union may be liable under § []8(b)(4)(ii)(B) for unlawfully coercing a secondary to cease doing business with the struck employer if the union's conduct amounts to harassment or involves repeated trespass or both." *Id.* at 722.

With respect to allegations that Berry, Union 135's agent, threatened Anderson directly, none of the allegations are actionable under NLRA § 8(b)(4) or LMRA § 303 because they did not involve a third party.

With respect to the Anderson's allegation that Berry called "Kimmy" at AJ's, what "Kimmy" told Anderson is hearsay and is inadmissible. Therefore, Anderson's claims regarding any statements made by Local 135 to AJ's are unsubstantiated and must be dismissed.

Similarly, Smith's statement to Anderson that Berry demanded that Smith discontinue his association with her, Am. Compl. ¶ 29, Anderson Dep. at 69, is hearsay. Further, a demand by Local 135 that Smith refrain from using Anderson's services without more is not a threat or coercive in any way and, therefore, is not actionable under either NLRA § 8(b)(4) or LMRA § 303.

Lastly, Anderson's allegations regarding statements made to CMG fail because they are hearsay as well. Even if they were not hearsay, Anderson testified that a different union, 716, called CMG and said that if it "didn't cease the relationship with [her] that there would be repercussions from that." Anderson Dep. at 73. There is no evidence that Local 135 had anything to do with this alleged conversation with CMG; therefore, Local 135 is entitled to summary judgment on those claims as well.

## IV. **CONCLUSION**

For the reasons stated herein, the Court **GRANTS** Defendant Teamsters Local 135's Motion for Summary Judgment on all of Plaintiffs', Precise Materials Services, Inc. and Nancy Anderson, claims against it. The Court will enter judgment accordingly.

IT IS SO ORDERED this 25th day of January, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

PRECISE MATERIAL SERVICES, INC.
1955 John Bart Road
Lebanon, IN 46052-1213

NANCY ANDERSON
1955 John Bart Road
Lebanon, IN 46052-1213

David T. Vlink
FILLENWARTH DENNERLINE GROTH &
TOWE LLP
dvlink@fdgtlaborlaw.com

Fred O. Towe
FILLENWARTH DENNERLINE GROTH &
TOWE LLP
ftowe@fdgtlaborlaw.com

Geoffrey S. Lohman
FILLENWARTH DENNERLINE GROTH &
TOWE LLP
glohman@fdgtlaborlaw.com

William R. Groth
FILLENWARTH DENNERLINE GROTH &
TOWE LLP
wgroth@fdgtlaborlaw.com